**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **GOLIAD COUNTY, TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-08-18** |
| | § | |
| **URANIUM ENERGY CORP.,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Defendant's Motion to Dismiss Third Amended Complaint (Dkt. No. 31), to which Plaintiff has responded (Dkt. No. 34). Having considered the motion, reply, and relevant law, the Court finds that the motion should be GRANTED.

**Background**

This citizen's suit arises out of Uranium Energy Corporations' ("UEC") attempt to obtain a Class III injection well permit from the Texas Commission on Environmental Quality ("TCEQ") for in situ uranium mining in Goliad County, Texas. Goliad County alleges that UEC, by failing to properly plug, seal, and re-topsoil numerous exploratory boreholes, allowed storm water to flow overland and enter the boreholes, resulting in the contamination of the Evangeline Aquifer, the underground aquifer which supplies Goliad County with groundwater. Goliad County claims that, in this manner, UEC "converted" the exploratory boreholes into "injection wells" without the required permits and in violation of federal law.

**A. Statutory Framework**

Congress enacted the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f *et seq.*, in order to protect the nation's drinking water by ensuring public water supply systems meet certain minimum

national standards. *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 768-69 (D.C. Cir. 1992). Specifically, the SDWA was passed to prevent "underground injection which endangers drinking water sources." 42 U.S.C. § 300h(b)(1); *W. Neb. Res. Council v. EPA*, 943 F.2d 867, 870 (8th Cir. 1991) ("The principal legislative history explains that the statute was primarily aimed at controlling underground injections of *waste*") (emphasis in original).

Part C of the SDWA, 42 U.S.C. §§ 300h-300h-8, created the Underground Injection Control ("UIC") program. The EPA oversees the UIC program, which may be implemented in part by the states, who can create their own UIC program subject to EPA approval. The regulations establishing the minimum requirements for UIC programs are codified at 40 C.F.R. Part 144. Under the UIC program, all injection wells require a permit. State plans must require that the applicant for the injection well permit demonstrate that the proposed injection will not endanger drinking water sources. 42 U.S.C. § 300h(b)(1)(A)-(B).

As part of the UIC program, the state must also classify injection wells in conformance with the classification system set forth by EPA in 40 C.F.R. §§ 144.6, 145.11(a)(2), 146.5. Thus, injection wells are classified into five categories, only two of which are relevant to this action. In situ uranium mining involves the injection of oxygen and bicarbonate into ore zones through injection wells to solubalize uranium, which is then pumped to the surface through production wells. Accordingly, in situ uranium injection wells are classified as Class III wells, which are wells designed for the injection of materials for the extraction of certain minerals. *Id.* §146.5(c)(2). Class V wells, on the other hand, are injection wells not properly included in the remaining four classes. *Id.* § 146.5(e)(4). Class V wells include wells "used to drain surface fluid, primarily storm runoff, into a subsurface formation." *Id.* § 146.5(e)(4).

In Texas, although in situ mining of uranium is regulated by the TCEQ under a grant of

jurisdiction from the EPA as part of the UIC joint federal-state scheme for regulation of underground injection wells described above, *uranium exploration* is regulated by the Railroad Commission of Texas ("RCT") pursuant to a grant of authority from the Texas Legislature. TEX. NAT. RES. CODE ANN. §§ 131.001 *et seq.*; TEX. WATER CODE ANN. §§ 27.001 *et seq.*  To explore for uranium, that is to conduct exploratory activities such as the drilling of exploratory boreholes for soil or water sampling, one must first obtain a permit from the RCT.  TEX. NAT. RES. CODE ANN. § 131.352(a).  Exploration activity permits govern "all activities associated with" uranium exploration and contain various requirements and restrictions related to "locating, drilling, plugging, and abandoning exploration holes." *Id.* § 131.353(a)-(b)(1).  The RCT has "exclusive jurisdiction and is solely responsible for the regulation" of such exploratory activities and is thus responsible for preventing the pollution of water sources stemming from the same. *Id.* §§ 131.022(b), 131.301; TEX. WATER CODE ANN. § 26.131(a)(1)-(2).

With these statutory responsibilities in mind, the RCT has many enforcement powers at its disposal including the authority to conduct inspections of exploratory holes and wells, issue Notices of Violation to noncompliant operators, require such operators to take specific corrective action, order the immediate cessation of activities that may harm the environment, and initiate proceedings for civil and criminal penalties or injunctive relief.  TEX. NAT. RES. CODE ANN. §§ 131.043-.046, 131.303-.305, 131.261-.270.

Once an exploring entity has identified uranium and filed an application for a Class III permit, a lengthy and complex administrative process unfolds before the TCEQ.  Although it is unnecessary to set forth each and every administrative step required before an applicant receives a permit and aquifer exemption, it suffices to say that the administrative steps are many.  For example, the TCEQ staff must first review the permit application for administrative completeness, issue notices to local governments

and "affected persons," and allow such parties to participate in the administrative process by filing comments and requesting a contested case hearing on the permit application. *See* 30 TEX. ADMIN. CODE §§ 39.651(c), 55.152, 55.156, 55.201(a)-(b), 281.3, 281.5; TEX. WATER CODE ANN. § 27.018(b).  The TCEQ's executive director must then review the applicant's compliance history, prepare a technical review of the application, and prepare a draft permit and technical summary.  30 TEX. ADMIN CODE §§ 60.3(a), 281.19(a), 281.21(b)-(c); 331.120(a)-(c).  Once again, local governments and "affected persons" must be given notice and an opportunity to file comments and request a contested case hearing. 30 TEX. ADMIN. CODE §§ 39.651(c), 55.152, 55.156, 55.201(a)-(b); TEX. WATER CODE ANN. § 27.018(b).  Only then is the permit application referred to the TCEQ Commissioners who, after responding to all significant public comments, may grant or deny the application in part or in whole. 30 TEX. ADMIN. CODE §§ 50.17(a), 50.117, 55.156(b).

Throughout this process, the TCEQ is required to consider various matters such as the information supplied by the application and technical summary, corrective actions proposed to prevent or correct pollution of underground sources of drinking water, a closure plan concerning the plugging and abandonment of any injection wells, and whether the applicant will provide the financial resources necessary to comply with its obligations. *Id.* §§ 331.44, 331.46, 331.86, 331.122, 331.142-44.  The TCEQ is also to consider "[a]ny additional information reasonably required by the executive director" for evaluating the proposed injection site and operations.  *Id.* § 331.122(4).  If the TCEQ grants the application, any "affected person" may challenge the permit by filing a suit for judicial review of the TCEQ's determination. TEX. WATER CODE ANN. § 5.351(a).

In addition to issuing a Class III injection well permit, to authorize in situ uranium mining, the TCEQ must designate portions of the potentially affected aquifer as exempt.  30 TEX. ADMIN. CODE §

4

331.13(c).  The processes of obtaining an injection permit and aquifer exemption generally mirror one another, and when the two are sought together, the notice and hearing provisions related to the permit application is joined with that concerning the exemption sought.

Once these processes have been completed, presuming the TCEQ both grants a permit and designates an aquifer (or portions of the aquifer) as exempt, the exemption would not become final unless and until it is approved by the EPA.  40 C.F.R. § 144.7(b)(2).  An affected person may then challenge the exemption by filing a lawsuit with a United States Court of Appeals for judicial review of the EPA's decision.  42 U.S.C. § 300j-7(a).

### B. Facts

As stated, Goliad County alleges UEC "converted" exploratory boreholes into "injection wells" without the required permits and in violation of federal law based on UEC's failure to properly plug, seal, and re-topsoil numerous exploratory boreholes.  Specifically, Goliad County complains about approximately 74 boreholes that were improperly plugged.  UEC drilled these boreholes as part of exploratory activities conducted pursuant to RCT Uranium Exploration Permit No. 123.  After inspecting the boreholes, the RCT issued UEC a Notice of Violation of TEX. ADMIN. CODE § 11.138(4)(A) for failure to properly re-topsoil the boreholes and for failure to properly plug the boreholes after water samples were taken.  Upon receipt of the Notice of Violation, UEC proceeded to address its violations.  In response to Goliad County's remaining concerns of groundwater contamination, a representative of the RCT, Tim Walter, inspected the boreholes and determined that no groundwater had been contaminated by UEC's exploratory activities.

Several Goliad County residents, however, including former Plaintiffs Craig and LuAnn

Duderstadt,[1] voiced further concern over the quality of the groundwater supplied by the Evangeline Aquifer.  The residents complained of, among other things, discoloration and slimy residue.  The residents had not previously experienced any problems with the quality of the groundwater.  On two separate occasions within a year of the RCT's issuing UEC the Notice of Violation, residents of Goliad County discovered additional boreholes alleged to be erroneously plugged and/or completely open.  It is not entirely clear how many additional boreholes were discovered, the state in which the boreholes were found, or the manner or extent to which UEC attended to them.  Goliad County alleges that storm water has flowed over and down some or all of these boreholes, contributing to and/or exacerbating the contamination of the Evangeline Aquifer's groundwater.  Nowhere in Goliad County's complaint does it allege that the exploratory boreholes were, in and of themselves, injection wells of any classification.

Relatedly, a permit application filed by UEC is currently pending before the TCEQ to allow UEC to conduct in situ solution mining to remove uranium from Goliad County's subsurface.  While a Class III permit for in situ mining cannot be issued if it would endanger an underground source of drinking water, if an underground aquifer were not suitable for drinking water purposes, the aquifer can be exempted and a Class III permit obtained.  Goliad County alleges that UEC collected "baseline" groundwater samples of the Evangeline Aquifer after it had contaminated the aquifer by way of its negligent exploration activities and intends to submit these samples to the TCEQ and EPA as evidence that the uranium mining site is unsuitable for drinking water purposes.

Goliad County alleges that because UEC failed to prevent the movement of fluid containing contaminants, it is in violation of the SDWA; to wit, EPA regulations 40 C.F.R. §§ 144.11, 144.12.  Goliad County seeks relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, and

---

[1] The Duderstadts, initially listed as plaintiffs to this action, have been dismissed from this case (Dkt. No. 51).

according to the common law tort claims of nuisance and nuisance per se.  Ultimately, the County seeks a declaration either prohibiting UEC from seeking an in situ mining permit from the TCEQ or prohibiting UEC from seeking such a permit prior to restoring the water quality to its pre-exploration condition.  Goliad County also prays for a declaration prohibiting UEC from seeking a permit by relying on the water quality data obtained after the pollution allegedly caused by UEC's exploratory activities.  Notably, Goliad County does not pray for injunctive relief ordering UEC to restore the Evangeline Aquifer to it pre-contamination status, but rather limits its requests to preventing UEC's application for and receipt of a permit for in situ mining.

UEC then filed the instant motion, which asks that this action be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, and in the alternative, that it be dismissed for failure to state a claim under Rule 12(b)(6).

## Standard of Review

Federal Rule of Civil Procedure 12(b)(1) permits dismissal for lack of jurisdiction over the subject matter.  When federal courts consider questions of subject matter jurisdiction, the precedent regarding its fundamental importance is clear.  "It is a fundamental principle that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking.  This is the first principle of federal jurisdiction." *Stockman v. Federal Election Commission*, 138 F.3d 144, 151 (5th Cir. 1998) (citation and quotation committed).  Under Fifth Circuit precedent, a case may be dismissed for lack of subject matter

jurisdiction under Rule 12(b)(1) based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff at all times bears the burden of establishing that the court has subject matter jurisdiction. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

Rule 12(b)(6) provides that a party may move to dismiss an action for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court must accept the plaintiff's allegations as true and draw all reasonable inferences in his favor. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993); *United States v. Gaubert*, 499 U.S. 315, 327 (1991). A court may not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999) (citing *St. Paul Ins. Co. of Bellaire, Texas v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279 (5th Cir. 1991)).

Dismissal can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *See Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998). While a complaint need not contain detailed factual allegations to survive a 12(b)(6) motion, the Supreme Court has held that a plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964–65, 1969 (2007) (abrogating the *Conley v. Gibson*, 355 U.S. 41 (1957) 'no set of facts' standard as "an incomplete, negative gloss on an accepted pleading standard") (citations omitted). Plaintiff must allege

"enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Id.* at 1974; *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007).

## Analysis

### I. Ripeness

Ripeness is a necessary component of subject matter jurisdiction, and a court lacks the authority to adjudicate the issues presented before it if they are not yet justiciable. *Sample .v Morrison*, 406 F.3d 310, 213 (5th Cir. 2005). The general purpose underlying the ripeness doctrine is to prevent courts from ruling on a claim that requires further factual development. *See John Corp. v. City of Houston*, 214 F.3d 583, 586 (5th Cir. 1987); *see also Abbott Labs. v. Garder*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977) (the rationale behind the doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreement over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.").

These guiding principles direct courts to dismiss cases which are abstract or hypothetical, as opposed to definite and concrete. *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003). Accordingly, when determining whether a claim is ripe, courts are to primarily refer to "the fitness of the issues for judicial decision and the hardship on the parties of withholding court consideration." *Id.* (quoting *John Corp.*, 214 F.3d at 586). In making this determination, "the court should evaluate three factors: (1) whether delayed review would cause hardship to the plaintiff; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the court[] would benefit

9

from further factual development of the issues presented." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 244-45 (5th Cir. 2006) (citation and quotations omitted); *see also Monk*, 340 F.3d at 282 (cases are considered ripe "if any of the remaining questions are purely legal ones; conversely a case is not ripe if further factual development is required") (citation and quotations omitted).

In *Monk*, the Fifth Circuit Court of Appeals addressed the ripeness of plaintiffs' claims that they had been injured by the TCEQ's failure to afford them certain due process rights while considering a landfill permit. *Monk*, 340 F.3d at 282-83. The *Monk* court determined that the plaintiffs' claims were not ripe for judicial review because the TCEQ permitting process had not yet run its course, the permit application "may or may not be granted," and the plaintiffs thus may or may not be harmed. *Id.* Despite Goliad County's arguments to the contrary, the Fifth Circuit's reasoning in *Monk* applies with equal force here as it did when it was penned: because UEC's permit application for in-situ mining and aquifer exemption is still pending, and the permit and aquifer exemption may or may not be granted, Goliad County's claims are not yet ripe for review.

The thrust of Goliad County's complaint, and the relief sought therein, indicates that it desires an order preventing UEC from going forward with the permitting process before the TCEQ, not an order directing UEC to engage in some sort of clean up activity independent of the process. In other words, Goliad County does not ask the court to order UEC to clean up the pollution allegedly stemming from its exploratory activities; Goliad County asks the Court to order UEC to clean the aquifer *if* it proceeds with its permit application and bar the TCEQ from considering the baseline water data provided by UEC in connection with its permit and aquifer exemption application.[2]

---

[2] Specifically, Goliad County prays for "an order prohibiting UEC from seeking an uranium in-situ mining permit from the TCEQ." (Dkt. No. 30 at 23). In the alternative, the County prays for "an order prohibiting UEC from seeking an uranium in-situ mining permit from the TCEQ *prior to* restoring water quality to the condition of pre-exploration" or an order that would prohibit UEC "from using any water quality data for purposes of establishing

Turning to the considerations identified by the Fifth Circuit in *Coliseum Square*, because the TCEQ has not yet decided whether to issue a permit, it appears clear to the Court that Goliad County will not suffer any harm by the delayed judicial review of its claims.  It appears equally clear that judicial review on the merits of Goliad County's claims would interfere with further administrative action.  As described above, the permitting and exemption application process is quite long, and would involve a number of future steps before an in situ permit could finally issue.  Although the Court is aware that certain administrative steps have been taken since the commencement of this suit, the TCEQ has not yet issued UEC a Class III permit for in situ uranium mining, the TCEQ has not yet exempted the Evangeline Aquifer (or portions thereof) for the purposes of UEC's proposed uranium operations, and the EPA has neither reviewed nor approved of the TCEQ's actions.  Therefore, many administrative steps remain before the permit and aquifer exemption made the basis of Goliad County's complaint are realized.  Similarly, because UEC has not completed the TCEQ's exhaustive administrative procedural requirements and neither the TCEQ, nor the EPA, has granted or approved of UEC's permit or request for aquifer exemption, much administrative work remains to be done, and this case would benefit from further factual development.

Goliad County argues that because there appears to be no *specific* mechanism or process under which they can bring their assertions before the TCEQ, the remaining administrative requirements are unhelpful in that they are unlikely to provide Goliad County with the relief it seeks.  That is, Goliad County claims to have no other legal venue within which to have this dispute adjudicated.  The Court, however, does not agree with Goliad County's narrow view of the remaining administrative

---

baseline water quality if such data was collected after initiation of the mining activity."  *Id.* (emphasis added).  Thus, the harm Goliad County wishes to avoid is the potential granting of an injection well permit and aquifer exemption, not the clean up of past pollution.

proceedings.  As described above, the TCEQ has broad powers of investigation and review, and at almost every stage in the permitting process, "affected persons" are entitled to seek contested case hearings.  Moreover, the Court is in no position to presume what the TCEQ (or the EPA) might or might not consider when determining whether UEC is entitled to an in situ mining permit or aquifer exemption.

The Court also notes that Goliad County has requested relief under the federal Declaratory Judgment Act, which is designed to "settle 'actual controversies' before they ripen into violations of law or a breach of contractual duty," *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949).  In this context, to present an "actual controversy," a plaintiff must satisfy the "injury in fact" element of standing by establishing "actual present harm or a *significant possibility* of future harm."  *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (emphasis added); *see also Shields v. Norton*, 289 F.3d 832, 837 (5th Cir. 2002) ("[W]e must not proceed [with requests for declaratory relief] until the issue is ripe—until we have that case or controversy."); *Dawson v. Dep't of Transp.*, 480 F. Supp. 351, 351 (D.C. Okl. 1979) (refusing to grant declaratory relief when such relief would "effectively pre-empt [a state agency] from deciding whether [a] required permit for [a] proposed landfill should be granted").  A declaratory judgment action, by its nature, applies to injuries that have not yet occurred. The issue is thus whether injury is sufficiently likely to justify judicial intervention.  *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895-96 (5th Cir. 2000).  For the reasons stated above, the injuries Goliad County seeks to avoid—the granting of a Class III injection well permit and aquifer exemption—are far from certain.  UEC faces many remaining administrative hurdles before a permit and exemption might issue and the TCEQ and/or EPA very well may deny UEC the allowances it seeks. Further litigation in this Court would clearly interfere with and possibly duplicate the currently ongoing

12

state administrative proceedings, and the Court thus does not believe discretion favors adjudication of Goliad County's present claims.  Accordingly, the Court concludes that this case is not yet ripe for judicial review.  Even assuming this action was ripe, however, Goliad County's claims would still fail for the reasons stated below.

## II. Safe Drinking Water Act Claim[3]

### A. Violation of the SDWA

As stated, Goliad County brings this action under the SDWA's citizen's suit provision, which provides that a person may bring suit "against any person . . . who is alleged to be in violation of any requirement prescribed by or under this subchapter."  42 U.S.C. § 300j-8.  For a court to exercise jurisdiction over a citizen's suit under the SDWA, a plaintiff must allege that a defendant is "in violation

---

[3] UEC has also challenged Goliad County's standing to file suit under the SDWA. Goliad County initiated this suit pursuant to the SDWA's citizen's suit provision, which allows any "person" to commence a civil action on his own behalf against any other person purported to be in violation of the statute's mandates. 42 U.S.C. §300j-8. At its outset, this suit was brought by Goliad County and two of its individual residents.  The individual residents, Craig and LuAnn Duderstadt, have since been dismissed from this action.

The SDWA, however, defines a "person" as an "individual, corporation, company, association, partnership, State, municipality, or Federal agency (including officers, employees, and agents of any corporation, company, association partnership, State, municipality, or Federal agency)."  42 U.S.C. § 300f(12).  The term "municipality," in turn, is defined as a "city, town, or other public body created by or pursuant to State Law, or an Indian Tribe." 42 U.S.C. § 300f(10).  In Texas, counties are established by Chapter 71 of the TEX. LOCAL GOV'T CODE, as authorized by ART. 9 SEC. 1 of the Texas Constitution. Texas counties, furthermore, are recognized as a "local government" entity under the Texas Water Code.  TEX. WATER CODE § 26.001(18); *see also* TEX. WATER CODE § 27.018 (recognizing that local governments, including counties, have standing to challenge injection well permit applications before state agencies). Therefore, Texas counties are considered persons that may have standing to bring a citizen suit under the SDWA.

Although Texas counties are considered persons under the SDWA and *may* have standing to file a citizen's suit, Goliad County lacks standing for a different reason.  The doctrines of ripeness and standing "often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury . . ." *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). This is particularly so when the purported injury is dependant on future events that may or may not occur, such as the granting of the Class III injection well permit at issue here.  To establish standing, a plaintiff must have suffered an "injury in fact," which the Supreme Court has identified as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]"  *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 560-61 (1992) (internal citation, quotation marks, and footnote omitted). For the reasons set forth above, the Court finds that Goliad County's injury—the fear that an injection well permit and aquifer exemption will be issued—is insufficiently actual or imminent to provide it standing. However, assuming *arguendo* that Goliad County's claims are ripe and it has standing, its claims fail as discussed below.

of" an SDWA mandate.  *See Mattoon v. City of Pittsfield*, 980 F.2d 1, 6-7 (1st Cir. 1992) (if a plaintiff fails to allege that a defendant is "in violation of" the SDWA, subject matter jurisdiction is lacking); *W. Neb. Res. Council v. Wyoming Fuel Co.*, 641 F. Supp. 128, 140 (D. Neb. 1986) (district court jurisdiction is expressly limited to actions concerning violations of an SDWA requirement or an EPA Administrator's failure to perform a non-discretionary act).

In accordance with the SDWA's purpose and the above-described federal-state regulatory framework, "it is clear that Congress dictated that *all* underground injection be regulated under the UIC programs."  *Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1474 (11th Cir. 1997) (emphasis in original).  Therefore, a vital question arises: is UEC's alleged "conversion" a violation of one of the SDWA's requirements and thus must be regulated under a UIC program? This question, in turn, depends on whether the activity alleged operates as an "underground injection" as that term is defined by the SDWA.

Section 144.11 of the EPA regulations promulgated alongside the SDWA prohibits "[a]ny underground *injection*" absent authorization by rule or permit. 40 C.F.R. § 144.11 (emphasis added). Section 144.12 provides that:

> no owner or operator shall construct, operate, maintain, *convert*, *plug*, abandon, *or conduct any other injection activity* in a manner that *allows* the movement of fluid containing any contaminant into underground sources of drinking water . . .

40 C.F.R. § 144.12(a) (emphasis added).

The EPA regulations define "underground injection" as "well injection," which, in turn, is defined as "the subsurface emplacement of fluids through a bored, drilled, or driven 'well.' " 40 C.F.R. § 144.3.  The regulations, furthermore, define "injection well" as a " 'well' into which 'fluids' are being injected."  *Id.*  The term "fluids" is defined as "any material or substance that flows or moves whether

in a semisolid, liquid, sludge, gas, or any other form or state." *Id.* Finally, the term "well" is defined as "a bored, drilled, or driven shaft whose depth is greater than the largest surface dimension." *Id.* The parties do not dispute that the exploratory boreholes made the basis of this suit are wells or that the storm runoff complained of constitutes a fluid.

Although cases interpreting Sections 144.11 and 144.12 and the terms identified therein are sparse, the Court finds two cases instructive. In *Legal Environmental Assistance Foundation, Inc. v. EPA* ("*LEAF*"), when confronted with whether hydraulic fracturing[4] fell within the statutory definition of "underground injection," the Eleventh Circuit Court of Appeals determined that "injection," as that term is used in the SDWA, means the act of "forc[ing] (a liquid) into a passage, cavity, or tissue." 118 F.3d 1467, 1474 (11th Cir. 1997) (quoting THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 983 (2d ed. unabridged 1987)).   Therefore, according to the *LEAF* court, "underground injection" meant the "subsurface emplacement of fluids by *forcing them into* cavities and passages in the ground through a well." *Id.* (emphasis added). It appears that the *LEAF* court is the only court to directly address the definition of "injection" in the SDWA context, and the Court finds its reasoning sound and conclusion persuasive.

In *Incorporated Village of Garden City v. Genesco, Inc.*, the court was faced with an SDWA claim against two defendants—a former owner of a fabric cutting mill that released pollutants via an injection well and the current owner of the site. 596 F. Supp. 2d 587, 590 (E.D.N.Y. 2009).   The injection well at issue was classified as a Class V injection well; to wit, a dry well used for the injection of wastes into a subsurface formation. *Id.*; *see also Genesco* Pl's. Compl., No. 07-CV-5244(JFB)(ETB),

---

[4] The *LEAF* court described hydraulic fracturing as the injection of fluids and a propping agent (usually sand) into a coal bed, which thereby exerts pressure on the bed, widens natural fractures, and ultimately allows for the stimulation of gas flow for natural gas recovery. *LEAF*, 118 F.3d at 1474.

Dkt. No. 1 at 4; 40 C.F.R. § 146.5(e)(5).  When the initial owner's lease expired, it did not properly close the injection well so as to prevent further contaminants from entering the well and into the underground source of the plaintiff-village's drinking water.  *Id.*  The subsequent owner also failed to properly close the injection well.  *Id.*  As a result of the defendants' collective failure to close the well, pollutants were released into the village's groundwater.  *Id.*  Although the *Genesco* court found that the SDWA claims against the initial owner failed as a matter of law because its actions occurred before the SDWA was passed, and the statute was not intended to be retroactive, it is the court's ruling as to the subsequent owner that this Court finds relevant.  As to the subsequent owner, the court found that the plaintiff's claim failed because the regulations applied only to owners or operators who (1) "are involved in 'injection activity' under Section 144.12(a)" or (2) " 'abandon a Class V well' without first properly closing it under Section 146.10(c)."[5] *Id.* at 598-600.  The *Genesco* court's ruling indicates that, although it did not expressly define "injection activity," it considered such an exercise to require some affirmative employment of action that either knowingly would result in—or was intentionally designed to provide for—the channeling of fluid into a well.  That is to say, one must, at a minimum, put in place mechanisms that would knowingly lead to some type of emplacement of fluid into a well.[6]  The subsequent owner's mere failure to close the well was insufficient as a matter of law to allow the SDWA

---

[5] As noted, Goliad County's operative complaint sets forth no allegations that UEC's exploratory boreholes were, or should be considered, Class V injection wells in and of themselves; rather, Goliad County alleges that the non-injection wells were *converted into* injection wells.  Although not made explicitly clear from Goliad County's complaint, it appears that it contends that UEC's exploratory boreholes were converted into Class V Drainage Wells, which are injection wells "used to drain surface fluid, primarily storm runoff, into a subsurface formation." 40 C.F.R. § 146.5(e)(4).

[6] Class V Drainage Wells, defined above, appear to be the only type of injection well contemplated by the EPA regulations that might fall outside of the *LEAF* court's definition of underground injection.  That is, one may construe the operation of a drainage well as merely channeling or directing fluids into the subsurface, as opposed to forcing the fluids into the ground.  To the extent the *LEAF* court's definition of injection activity is underinclusive in this manner, the *Genesco* court's application of the SDWA—and this Court's understanding of the statutory framework—makes clear that, at a minimum, one must be aware that their actions will result in the funneling of fluid into the subsurface.  As explained further below, the Court believes that the SDWA does not require an entity to apply for a permit to perform an activity it was unaware would take place.

claim to stand.  Like the ruling in *LEAF*, the Court finds the *Genesco* court's reasoning sound and persuasive.

It is clear to the Court that, in accordance with the definition of "injection" and "injection activity," as defined and applied by the above cases, an injection (or injection activity) requires, at a minimum, some action that either knowingly would result in—or is designed to allow for—the funneling of fluid into a well, and at a maximum, a calculated use of force designed to propel such fluid into a well.  *See LEAF*, 118 F.3d at 1474; *Genesco*, 596 F. Supp. 2d at 590; *see also* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 638, 748 (2d ed. unabridged 1987) (defining "emplacement" as "putting in place or position" and defining "force" as "to deprive or compel against resistance").  A purely unknowing and passive allowance, would not, in the Court's view, be sufficient to cause the "injection" of some substance into the ground or otherwise constitute an "injection activity."

The Court, moreover, defines "convert" as "to change (something) into a different form."  *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 444.  Consistent with the Court's reasoning above, the Court finds that a "conversion" of a well requires some knowing or deliberate exercise or use of force.  The parties have failed to identify and the Court has not on its own discovered any authority indicating that a well can be converted into an injection well without knowledgeable or deliberate effort.  Thus, for UEC to have converted the exploratory boreholes into injection wells, UEC would have to have plugged the boreholes with, at a minimum, knowledge that the erroneous manner in which the boreholes were plugged would allow storm water to enter the subsurface.  Scanning Goliad County's Third Amended Complaint, the Court cannot identify an allegation that UEC knowingly or deliberately channeled fluid into the subsurface or knowingly or deliberately changed its boreholes into

17

injection wells.[7]

Goliad County argues that the inclusion of the term "allows" by Section 144.12 provides for the possibility of a passive violation.  As an initial matter, this underscores the Court's earlier conclusion that the allegations here do not provide an inference that UEC put in place the mechanisms leading to the subsurface emplacement of fluids with knowledge or intent that such an event would take place. Moreover, although the Court acknowledges that the term "allows" indicates that some type of passive violations are possible, the term's placement indicates that it refers to a *secondary* passive violation. That is to say, one must first engage in some active "injection activity" and then, by a secondary, non-active violation, such as failing to properly plug an injection well, potentially violate Section 144.12(a)'s mandate.  The allegations here do not indicate such a claim exists.

As the Court understands it, Goliad County contends that a functional definition of injection activity and conversion should guide the Court's analysis.  Goliad County would like the Court to rule that UEC's exploratory wells were converted into injection wells simply because storm water came to find its way into the subsurface, whether or not UEC knew that such a result would occur.  If the Court

---

[7] Goliad County alleges, under the section titled "Cause of Action No. 1: Violation of SDWA" (and not under the various preceding fact sections), that UEC's "pattern of intentional disregard of these plugging requirements is sufficient to lead to the inference of intent to emplace fluids in the subsurface." Dkt. No. 30, ¶ 144. Although Goliad County apparently attempts to couch this allegation as a proposition of fact or a reasonable inference therefrom, the Court believes it to be one more accurately characterized as a conclusion of law, which the Court is not mandated to, and does not, accept as true. *See Ashcroft v. Iqbal*, --- S. Ct. ----, 2009 WL 1361536, at *13 (May 18, 2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993) (conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss); *Amsterdam Tobacco Inc. v. Phillip Morris Inc.*, 107 F. Supp. 2d 210, 213 (S.D.N.Y. 2000) ("[T]he court is not required [] to accept as true 'conclusions of law or unwarranted deductions.' ") (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)). This is the sole mention of UEC's intent or any inference thereof. The overarching theme of Goliad County's complaint, however, is that, through UEC's *negligence*, it "converted" the boreholes into "injection wells."  Nowhere in Goliad County's complaint can the Court identify any *factual* allegation supporting the conclusion that UEC knew or intended that its erroneous plugging actions would result in the subsurface runoff complained of here. Because injection and conversion require, at a minimum, an affirmative action that would knowingly lead to the emplacement of fluids into a well, the Court finds Goliad County's allegations regarding an "inference of intent" unavailing.

were to adopt Goliad County's view, however, the ensuing practical result would place exploring entities in an untenable situation.  The very notion of requiring an exploring entity to apply and obtain a permit implies that they have some knowledge or intention that a future planned action take place.[8] Under the Goliad County's theory of the case, a putative defendant might be held responsible under the SDWA for failing to apply for a permit to do something they were unaware would occur.  Practically speaking, uranium mining companies such as UEC would be placed in a situation in which, while conducting exploratory activities pursuant to a permit from the RCT, they would also have to apply for an injection permit to cover their potentially negligent future plugging activities.  The Court finds it doubtful that such a scenario was envisioned when the UIC program was created.  Although some federal environmental statutes provide for strict liability, such as the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, there is no indication that the SDWA was intended to implement such a scheme.  While the negligent closure or plugging of exploratory boreholes might lay the foundation for a common law cause of action, and perhaps a state regulatory claim as well, such an unknowing and  passive error does not provide the basis for a claim based on the defendant's failure to obtain a permit.

The above holdings are further supported when one considers the context of the statute.  When viewed in whole, it is apparent that the SDWA and its component regulations focus not merely on the result of some owner or operator's actions or inactions, but rather on an owner or operator's understanding that its conduct would lead to an injection or injection activity.  *See, e.g.*, 40 C.F.R.

---

[8] Certain Class V injection wells can be authorized by rule and thus do not need to be supported by permit. *See* 40 C.F.R. 144.82, 144.84(b)(4).  However, for this operation by rule exception to apply, an owner or operator must first comply with several regulatory obligations, including the submission of detailed inventory information prior to injection. *Id.*; 40 C.F.R. 144.83(a). The concerns surrounding the submission of such inventory information mirror the concerns raised by applying for a permit: one would have to be aware they are going to conduct an injection activity to comply with either requirement.

144.1(g)(1)(ii) (identifying as an injection activity covered by a UIC regulation "[a]ny dug hole or well that is deeper than its largest surface dimension, *where the principal function of the hole is emplacement of fluids*") (emphasis added); 40 C.F.R. 144.1(g)(2)(v) (specifically excluding from coverage "[a]ny dug hole, drilled hole, or bored shaft which *is not used for the subsurface emplacement of fluids*") (emphasis added). Section 146.5, titled "Classification of Injection Wells," consistently identifies a well's class by what activity the well is *used for*. *See* 40 C.F.R. 146.5. Particularly relevant to this case is the definition of a Class V Drainage Well as a well "*used to* drain surface fluid, primarily storm runoff, into a subsurface formation." 40. C.F.R. § 146.5(e)(4) (emphasis added). Goliad County has simply failed to set forth any allegations indicating, and the surrounding circumstances do not otherwise justify a conclusion that, UEC knew or intended that its exploratory activities or the plugging of its exploratory boreholes would result in the emplacement of fluids into the subsurface. Accordingly, Goliad County's allegations do not give rise to a claim under the SDWA.

Because the touchstone of Goliad County's SDWA claim is its allegation that UEC "converted" the exploratory boreholes into "injection wells" and/or an "injection activity," and the Court has concluded that no such conversion or injection activity took place, the Court must conclude that subject matter jurisdiction over Goliad County's SDWA claim is lacking.

### III. Declaratory Judgment Act Claim

The DJA authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such a declaration. . . ." 28 U.S.C. § 2201(a). The DJA, however, does not provide courts an independent source of federal jurisdiction, but rather only provides litigants a remedy once jurisdiction is found to exist on another ground. *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*,

339 U.S. 667, 671 (1950)).

Because the Court has determined that it lacks subject matter jurisdiction over Goliad County's SDWA claim, and Goliad County has not cited any other ground vesting the Court with jurisdiction over this action, the Court concludes that it lacks subject matter jurisdiction over Goliad County's DJA claim.

**IV. State Law Claims of Nuisance and Nuisance Per Se**

The parties also argue over whether the Court should assert supplemental jurisdiction over Goliad County's state law claims of nuisance and nuisance per se. The Court has already ruled that Goliad County's federal claims are not ripe for judicial review, its SDWA claim fails, and its DJA claim does not otherwise provide an independent basis for federal jurisdiction. Accordingly, Goliad County has not set forth a claim that provides the Court with original subject matter jurisdiction. To invoke discretionary supplemental jurisdiction over related state law claims, a party must first invoke federal subject matter jurisdiction on another basis. *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558-559 (2005); *see also* 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3567 at 314 n.3 (2d ed. 1984).

Moreover, even if the Court had original jurisdiction over Goliad County's federal claims, but they failed for another reason, the decision to exercise supplemental jurisdiction over state law claims under FED. R. CIV. P. § 1367(c) after dismissing the underlying federal claims is a matter left to the sound discretion of the Court. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Heaton v. Monogram Credit Card Bank*, 231 F.3d 994, 997 (5th Cir. 2000). When determining whether to maintain jurisdiction after the dismissal of all federal claims, "courts should exercise their discretion in a way that best serves the principles of economy, convenience, fairness, and comity." *Doddy v. Oxy U.S.A., Inc.*, 101 F.3d 448, 456 (5th Cir. 1996) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

357 (1987)).  In the usual case, however, once a court has dismissed all federal claims, these factors counsel in favor of dismissing the state causes without prejudice.  *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) (observing that "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed").  When the remaining issues of state law are not complex or when the court has invested a significant amount of time and resources in a case, retention of the state law claims may be appropriate.  *See Smith v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002); *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999).

Here, the Court has only been called to adjudicate the present motion and has not considered any substantive issue concerning Goliad County's state law claims.  Moreover, in consideration of the Court's determination that the County's SDWA claim fails as a matter of law, there is no overriding federal interest in retaining this action.  To the contrary, the comprehensive state regulatory scheme in place here— Texas' uranium exploratory oversight administered by the RCT and in situ uranium mining oversight administered by the TCEQ—indicates that Texas' administrative agencies, and not the federal courts, have a more compelling interest in adjudicating this dispute at this time.  *See* TEX. NAT. RES. CODE ANN. §§ 131.001 *et seq.*; TEX. WATER CODE ANN. §§ 27.001 *et seq.*  Moreover, although the parties appear to have engaged in significant discovery, should Goliad County ultimately choose to bring its claims in a state court or further present its arguments to the RCT or TCEQ, it will not be prejudiced because it will have the benefit of the discovery conducted in this action.  Accordingly, Goliad County's negligence and negligence per se claims should be dismissed also.

### Conclusion

The Court is not without sympathy regarding Goliad County's claims.  Allegations that UEC negligently plugged its boreholes resulting in environmental contamination are both serious and evoke

concerns sensitive to individuals living in the surrounding areas.  The Court, however, is also mindful that the SDWA and the considerations surrounding fitness for judicial review only provide the federal courts jurisdiction in limited circumstances.  Such circumstances do not exist here.  Moreover, Goliad County's state law claims, and the remainder of the Class III permitting process, provide it with sufficient avenues for redress.

Based on the foregoing, Defendant's Motion to Dismiss Third Amended Complaint (Dkt. No. 31) is **GRANTED** and this action is **DISMISSED**.

It is so **ORDERED**.

Signed this 5th day of June, 2009.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE